IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| STEPHANIE REED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 04-1475-KAJ |
| | ) | |
| JOANNE B. BARNHART, Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Michael J. Goodrick, Esq., Michael J. Goodrick, P.A., 18B Trolley Square, P.O. Box 134, Wilmington, Delaware 19899; Counsel for Plaintiff.

David F. Chermol, Social Security Administration, Office of Regional Counsel, Region III, P.O. Box 41777, Philadelphia, Pennsylvania 19101; Counsel for Defendant.
    <u>Of counsel</u>: Donna L. Calvert, Social Security Administration, Office of Regional Counsel, Region III, P.O. Box 41777, Philadelphia, Pennsylvania 19101.

Wilmington, Delaware
March 9, 2006

JORDAN, District Judge

I. **INTRODUCTION**

Before me is a Motion for Summary Judgment (Docket Item ["D.I."] 12) filed by plaintiff Stephanie Reed ("Reed"), and a Motion for Summary Judgment (D.I. 18) filed by the defendant, Joanne B. Barnhart, Commissioner of Social Security (the "Commissioner"). Reed brings this motion under 42 U.S.C. § 405(g) for review of the final decision of the Commissioner denying her disability insurance benefits under title II of the Social Security Act (the "Act"), 42 U.S.C. §§ 401-433. Jurisdiction is proper under 28 U.S.C. § 1331 and 42 U.S.C. § 405(g). For the reasons that follow, the Commissioner's Motion will be granted, and Reed's Motion will be denied.

II. **BACKGROUND**

A. Procedural Background

Reed applied for disability insurance benefits on February 20, 2003,[1] alleging that she became unable to work on September 19, 2001 due to reflex sympathetic dystrophy ("RSD"). (D.I. 10, Transcript, at 108-10, 131.) After the application was denied both initially (id. at 81-84) and upon reconsideration (id. at 87-91), Reed requested a hearing before an administrative law judge ("ALJ") (id. at 92). At the hearing before the ALJ on July 14, 2004, Reed testified, and was represented by counsel. (Id. at 25-69.) A vocational expert also testified. (Id. at 69-77.) On August 20, 2004, the ALJ issued a decision finding that Reed was not disabled within the meaning of the Act. (Id. at 15-23.)

---

[1] Both parties and the ALJ state that the application was filed on March 3, 2003. However, it appears that the application was transmitted on February 20, 2003. (D.I. 10 at 108-10.) This difference in dates has no bearing on my decision here.

Reed then requested review of the ALJ's decision by the Social Security Administration Appeals Council. (*Id.* at 10-11.) The Appeals Council concluded that there was "no reason under [their] rules to review the ... decision." (*Id.* at 5-8.) Thus, the ALJ's decision became the final decision of the Commissioner of Social Security. *See* 20 C.F.R. §§ 404.955, 404.981, 422.210; *see also Sims v. Apfel*, 530 U.S. 103, 106-07 (2000) (noting that, if Appeals Council denies request for review, the ALJ's decision becomes Commissioner's final decision); *Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001) (same). Reed now seeks review by this Court under 42 U.S.C. § 405(g).

    B.    <u>Facts</u>

Reed was born on December 18, 1970 (D.I. 10 at 111), and was thirty years old on the date she allegedly became disabled, and thirty-three on the date of the ALJ's decision. Reed has an eleventh grade education. (*Id.* at 29-30.) She has worked in food service (*id.* at 31), as a cashier in a deli (*id.*), as a child-care worker (*id.* at 31, 36), as an emergency medical technician and ambulance attendant (*id.* at 32), and as a resident manager at a rehabilitation center (*id.* at 33-35). She alleges that she became disabled on November 19, 2001 when she hit her right elbow on a metal casing while attempting to lift a milk crate with four gallons of milk in it. (*Id.* at 37.) She alleges that the immediate pain from this injury was so intense that it caused her to vomit. (*Id.* at 37-38.)

1.  Medical Evidence

Reed's medical history with respect to this incident is extensive.[2] Within a few days of her injury, on September 25, 2001, Reed was seen by Dr. John Hogan at First State Orthopaedics, who noted that despite "ecchymosis and swelling around the elbow,"[3] that the injury was "more soft tissue than it [was] boney" and that the x-ray report had no evidence of a fracture. (D.I. 10 at 175.) Nevertheless, Dr. Hogan put Reed in a long arm cast. (*Id.*) When Dr. Hogan checked the injury two weeks later on October 9, 2001, he noted Reed's complaints of swelling and discomfort, and that the x-ray report from that day was still negative for fracture "or other pathology." (*Id.*) On October 23, 2001, Reed "cried with pain" during her visit, and Dr. Hogan removed the cast, and sent her for a bone scan. (*Id.*) On October 30, 2001, Dr. Hogan noted that the bone scan was negative, and that "the reason for her persistent pain, tenderness posterior is unclear." (*Id.* at 174; *see also id.* at 183.)

Dr. Hogan sent her for an MRI, which was performed on November 12, 2001, and he noted on November 29, 2001 that it was negative. (*Id.* at 174; *see also id.* at 181.) On that date, he also noted that her elbow had "improved a little" but that she still had pain running down to her fingers, so he ordered an electromyographic study ("EMG") to check for nerve damage. (*Id.* at 174.) The EMG was performed on December 4, 2001, and was normal, showing no damage. (*Id.* at 180.) On December

---

[2] Reed also injured her right arm in July of 1996 when she was working as an ambulance attendant at Delaware Park. (D.I. 10 at 176-78.) She had a small fracture in her thumb, and some numbness in her arm. (*Id.*)

[3] "Ecchymosis" is a medical term for bruising. MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 364 (10th ed. 2002).

3

18, 2001, Dr. Hogan noted that despite improvement in Reed's range of motion, she complained that "her pain [was] a bit worse." (*Id.* at 197)  He thus sent her to see Dr. Randeep Kahlon for further evaluation.

After examining Reed, Dr. Kahlon noted that all tests "revealed no organic pathology[,] but it is clear that [Reed] has persistent pain." (*Id.* at 172.)  Dr. Kahlon also ordered nerve blocks, which Reed reported were unsuccessful in alleviating her pain. (*Id.*; *see also id.* at 39.)  Reed testified that pain "radiated from one side over to [her] chest and down [her] back", which was why the nerve blocks were tried.

Reed testified that she was next sent for a Worker's Compensation evaluation to a Dr. Parkerson, whose medical notes and records are not contained in the transcript. (*Id.* at 39-40.)  Reed states that Dr. Parkerson diagnosed her with reflex sympathy dystrophy ("RSD"), and sent her to see Dr. Steven Grossinger. (*Id.* at 40.)

Reed first saw Dr. Grossinger on April 24, 2002, at which time Dr. Grossinger noted that her "prognosis for recovery is guarded to poor" and that her "clinical presentation ... is highly suggestive of complex regional pain syndrome." (*Id.* at 202.) During this visit, Dr. Grossinger performed a second EMG, and noted, in summary, that it was "a normal study of the right upper extremity." (*Id.* at 205.)  At a follow-up visit on May 22, 2002, Dr. Grossinger noted color and temperature changes in the arm, as well as problems with concentration and memory. (*Id.* at 199.)  He further stated that "Ms. Reed presents with a clinical presentation consistent with reflex sympathetic dystrophy (complex regional pain syndrome)." (*Id.* at 200.)  Dr. Grossinger ordered trial of home

4

treatment with electrical muscle stimulation, and additional medication.[4] (Id. at 200.) On July 22, 2002, Dr. Grossinger noted that Reed's pain in her right arm had not changed, and that she was seeking a consultation about breast reduction to decrease pain in her arm and back.[5] (Id. at 196.) A note from a visit on August 15, 2002 repeated Reed's complaints of pain and cognitive problems, and noted that her pain extended beyond her arm into her thorax. (Id. at 192.) In this note, Dr. Grossinger stated that Reed was "unfit for returning to employment at this time," and sent Reed to a pain specialist, Dr. Philip Kim. (Id. at 193.)

Reed first saw Dr. Kim on September 12, 2002. (Id. at 232-34.) At that visit, Dr. Kim stated that Reed had "signs and symptoms of complex regional pain syndrome, Type II," and that because conservative therapies for controlling her pain had failed, he was "consider[ing] ... a trial of spinal cord stimulation prior to a permanent implantation." (Id.) On September 19, 2002, Dr. Kim implanted a trial stimulation unit. (Id. at 231.) On October 3, 2002, he noted that there was 30% improvement with the stimulation.[6] (Id. at 230.) Thus, Reed subsequently had a permanent stimulator implanted in her spinal cord. (Id. at 228.) At a follow-up visit, Dr. Kim noted that Reed was experiencing

---

[4] Reed was treated with a variety of medications for her pain. At her initial visit with Dr. Grossinger, he noted that Reed had been taking Percocet, Ibuprofen and Gabritil. (Id. at 204.) During his treatment, he prescribed increasing levels of Neurontin, along with Elavil, electrical muscle stimulation, and a Lodiderm patch (See id. at 204, 200, 196.)

[5] Reed in fact underwent breast reduction surgery on March 11, 2003. (D.I. 10 at 257-59.)

[6] In her testimony before the ALJ, Reed stated that the temporary stimulation unit gave her 20% relief of pain. (D.I. 10 at 46.)

relief of pain. (*Id.* at 227.) However, at a visit on December 12, 2002, Reed was again complaining of pain, and "rate[d] her pain as 10/10." (*Id.* at 223.) Dr. Kim still noted, however, that Reed was "doing quite well with stimulation." (*Id.*) On January 23, 2003, Dr. Kim stated that Reed "ha[d] done reasonable well and [was] quite satisfied with the stimulation[,]" but noted that she complained of worsening pain in cold weather. (*Id.* at 222.) On February 13, 2003, Dr. Kim saw Reed and noted that she was "doing well with stimulation that seems to be working. She still [had] some pain ... [but was] doing much better." (*Id.* at 220.)

Reed visited Dr. Grossinger again on February 14, 2003, where Dr. Grossinger noted that Reed "continue[d] to have a lot of discomfort involving the right arm, neck and back ... [but] she ha[d] noted some improvement with the implanted stimulating unit." (*Id.* at 185.) On May 2, 2003, Dr. Kim noted that Reed "ha[d] done quite well with stimulation and [was] quite satisfied. She [was] still getting greater than 50% relief and [was] able to function." (*Id.* at 218.) At this visit, Dr. Kim also noted that Reed had "intermittent numbness sporadically in her knee, her leg, and also in her left arm." (*Id.*) Reed also saw Dr. Kim on May 22, 2003 and June 18, 2003, with complaints about the battery for the stimulator, which were resolved by a procedure on June 18. (*Id.* at 212-17.)

On January 14, 2004, Dr. Grossinger again evaluated Reed, noting that she was taking Topamax and Percocet for pain, as well as Elavil and Kadian. (*Id.* at 260-61.) He also noted that she had weakness in her knees, and thus was wearing knee braces bilaterally. (*Id.*) Furthermore, Dr. Grossinger stated that although the pain is largely in

her right arm, it also extended into her left arm as well. (*Id.*) At the end of his note, Dr. Grossinger stated that Reed was "clearly unfit for employment." (*Id.* at 261.)

Reed was also being treated by Dr. Khaja Yezdani, her family doctor, from a time before her injury until at least May 11, 2004. (*See id.* at 264-84.) On July 29, 2004, Dr. Yezdani filled out a report about Reed's ability to work. In that report, Dr. Yezdani indicated that Reed could carry less than ten pounds in either her right or left hand, could stand and walk, with normal breaks, for less than two hours a day, could sit, with normal breaks, for less than two hours a day, and could sit or stand for only fifteen minutes without changing position. (*Id.* at 293-94.) He also stated that she must walk around every fifteen minutes for at least fifteen minutes, and required the opportunity to shift at will from sitting to standing or walking. (*Id.* at 294.) He also indicated that she would need to be able to lie down at unpredictable intervals approximately two times in an eight hour day. (*Id.*) Dr. Yezdani noted that Reed could never twist or climb ladders, but could occasionally stoop or bend, crouch or climb stairs. (*Id.* at 294-95.) He further stated that Reed would be absent from work more than three times a month. (*Id.* at 296.)

Two Residual Functional Capacity Assessments were performed on May 1, 2003 and September 10, 2003. In the first of these assessments, the examiner found that Reed was limited in the use of her upper right extremity, but could sit, stand, or walk for about six hours in an eight hour workday, and lift up to twenty pounds with her left hand, and up to ten pounds with her right. (*Id.* at 238.) The examiner also found that she should not be exposed to extreme cold, vibrations, or hazards, and that she was limited

7

in how often she could crawl. (*Id.* at 239-41.) The second examiner's findings were nearly identical, adding that she was limiting in climbing, and should not be exposed to wetness or humidity. (*Id.* at 250-52.)

An additional medical examination was performed on December 16, 2002 by Dr. Stephen J. Rodgers. (*Id.* at 287-91.) This medical evaluation summarized all of Reed's medical records to that date, her subjective complaints, and Dr. Rodgers's physical findings. (*Id.*) Dr. Rodgers noted that Dr. John Parkerson, whose opinions do not appear elsewhere in the record, stated that Reed "did not demonstrate a clinical picture which was consistent with reflex sympathetic dystrophy or chronic regional pain syndrome," and that "[h]is opinion was she had a symptom magnification disorder." (*Id.* at 289.) Dr. Rodgers found that, under the principles of the Guides to the Evaluation of Permanent Impairment, "the percentage of permanent impairment to the right upper extremity causally related to the work injury in question [was] 30%." (*Id.* at 291.)

At the hearing before the ALJ, Reed reiterated many of her complaints of pain, including, for example, that the pain is constant (*id.* at 43), that she has trouble using her fingers because she has agonizing pain (*id.*), and that her fingers cramp up and ache (*id.*). She further complains of swollen legs (*id.* at 43-44), that she is "always nauseated" (*id.* at 48), and is highly sensitive to touch (*id.* at 49 ("Everything hurts. My clothes, wearing a bra. ... everything that touches my skin hurts. I hurt all the time and its severe"); *see also id.* at 63 (stating that someone touching her "feels like you're just taking something and just digging it through my skin.")). Additionally, she states that her daily life is affected, as she has trouble dressing herself (*id.* at 50), has trouble

holding on to things with both her left and right hands (*id.* at 52), that her knees give out (*id.* at 56), that she can't remember what she reads, and can no longer draw and paint (*id.* at 54), that her handwriting is illegible (*id.* at 58), that she sleeps only up to four hours a night (*id.* at 59, 61), and that none of the pain medications that she has been prescribed have taken away any of her pain, but instead just make her groggy (*id.* at 60-61).

### 2. The ALJ's Decision

To determine whether a claimant is entitled to social security disability benefits, an ALJ applies a sequential five-step inquiry pursuant to 20 C.F.R. § 404.1520. *See Morales v. Apfel*, 225 F.3d 310, 316 (3d Cir.2000) (establishing five steps); *Brewster v. Heckler*, 786 F.2d 581, 583 (3d Cir.1986) (same).

> Under that five step analysis, the [ALJ] determines first whether an individual is currently engaged in substantial gainful activity. If that individual is engaged in substantial gainful activity, he will be found not disabled regardless of the medical findings. If an individual is found not to be engaged in substantial gainful activity, the [ALJ] will determine whether the medical evidence indicates that the claimant suffers from a severe impairment. If the [ALJ] determines that the claimant suffers from a severe impairment, the [ALJ] will next determine whether the impairment meets or equals a list of impairments in Appendix 1 of sub-part P of Regulations No. 4 of the Code of Regulations. If the individual meets or equals the list of impairments, the claimant will be found disabled. If he does not, the [ALJ] must determine if the individual is capable of performing his past relevant work considering his severe impairment. If the [ALJ] determines that the individual is not capable of performing his past relevant work, then she must determine whether, considering the claimant's age, education, past work experience and residual functional capacity, he is capable of performing other work which exists in the national economy.

*Brewster*, 786 F.2d at 583-84 (internal citations omitted); *see also* 20 C.F.R. § 404.1520(a)(4).

In applying this five step analysis, the ALJ determined that Reed is not disabled within the meaning of the Act. (D.I. 10 at 22-23.) After determining that Reed was not engaged in substantial gainful activity, the ALJ found that Reed's RSD is a severe impairment within the meaning of the Regulations, but is not severe enough to meet or medically equal one the impairments listed in Appendix 1, Subpart P, Regulations No. 4. (*Id.* at 16-17.) Thus, the ALJ, pursuant to steps four and five of the analysis, had to determine whether Reed retained the residual functional capacity to perform either her past relevant work or other work existing in significant numbers in the national economy. (*Id.* at 18.) In making that determination, the ALJ considered all of Reed's symptoms, her medical reports, the opinions of her doctors, and the opinion of the vocational expert. (*Id.*) The ALJ also appears to have relied on observations of Reed's physical appearance and behavior, observations made during the July 14, 2004 hearing. (*Id.* at 18, 21.)

Although the ALJ considered the medical evidence submitted by Reed, she did not accord controlling weight to the opinions of Dr. Grossinger and Dr. Yezdani, as she did not find Reed's subjective complaints credible.[7] (*Id.* at 20-21.) Indeed, the ALJ stated that she found Reed's "subjective complaints and allegations to be entirely incredible... ." (*Id.* at 17.) Based on a review of the medical evidence, the ALJ determined that Reed had the "following residual functional capacity: limitation on sitting/standing or walking. No use of the dominant upper extremity. Lift 10 pounds

---

[7] The ALJ appears to have based her credibility determination on a number of factors, which will be described below. (*See infra* at 14-15; *see also* D.I. 10 at 21; *id.* at 283.)

10

with the nondominant upper extremity use [sic]. No fine dexterity. Can write check marks, etc., not paragraphs. Thus, she has a residual functional capacity for a limited range of light work (20 CFR § 404.1567)." (*Id.* at 22-23.) After posing these limitations to the vocational expert, the vocational expert testified that Reed could perform her past relevant work as a resident manager at the rehabilitation facility, which he classified as skilled, light duty work. (*Id.* at 69-70.)

Based on this testimony, the ALJ found that Reed could perform her past relevant work. (*Id.* at 21.) The ALJ, however, went further and found that, even if Reed could not do her past relevant work, she was capable of doing work that exists in the national economy. (*Id.* at 21-22.) The ALJ found that Reed is a younger individual with a limited education, and no transferrable skills. (*Id.* at 22.) The vocational expert testified that, considering each of these things, and further assuming that Reed lacked the concentration to perform a semi-skilled job, Reed could fill several unskilled jobs, including gate attendant, some security guard jobs, and school bus monitor. (*Id.* at 22.) Thus, because the ALJ found that Reed had sufficient residual functional capacity to perform either her past relevant work, or other work that exists in the national economy, the ALJ concluded that Reed was not disabled within the meaning of the Act.

### III. STANDARD OF REVIEW

Judicial review of the denial of an application for Social Security benefits is limited to determining whether there is substantial evidence to support the Commissioner's decision. 42 U.S.C. § 405(g); *see Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir.1999) (defining "substantial evidence"). Substantial evidence is "more than

11

a scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

## IV.   DISCUSSION

Reed claims that the ALJ's findings are not supported by substantial evidence for two reasons. (D.I. 13 at 15-20.) First, Reed alleges that the ALJ supplanted the medical evidence provided by Reed's doctors with her own opinion of Reed's condition, thus engaging in the "roundly condemned 'sit and squirm' method of deciding disability cases." (*Id.* at 16, citing *Van Horn v. Schwieker*, 717 F.2d 871, 874 (3d Cir. 1983).) Second, Reed claims that the ALJ's opinion is internally inconsistent, and thus should be rejected. (*Id.* at 17-20.) I address each of these arguments in turn.

### A.   Weighing of Evidence

Reed urges that "it is the uncontradicted record of five treating physicians" that she suffers from pain and limitations as a result of RSD, and that the ALJ simply rejected this evidence, relying only on her own evaluation of Reed's medical condition at the hearing, and the residual function capacity reports prepared by doctors that did not examine Reed. (D.I. 13 at 15-17; D.I. 20 at 6-10.) Reed is correct to note that residual function capacity forms alone are not substantial evidence. *See Green v. Schweiker*, 749 F.2d 1066, 1071 n.3 (3d Cir. 1984) ("Standing alone, however, a physical capacities evaluation form is not substantial evidence."); *O'Leary v. Schweiker*, 710 F.2d 1334, 1341 (8th Cir. 1983) (finding that "our Court has held that while ... [the physical capacities checklist] forms are admissible, they are entitled to little weight and

12

do not constitute 'substantial evidence' on the record as a whole"). Reed is also correct that "[a]lthough an ALJ may consider his own observations of the claimant ... they alone do not carry the day and override the medical opinion of a treating physician that is supported by the record." *Morales v. Apfel*, 225 F.3d 310, 318 (3d Cir. 2000).

However, while the medical opinions of Reed's treating physicians should be given "special significance," Social Security Ruling 96-5p, 1996 WL 374183, at *2, the ALJ was not required to give controlling weight to the statements of any of Reed's treating physicians regarding Reed's being disabled or unfit for work. *Id.* ("treating source opinions on issues that are reserved to the Commissioner are never entitled to controlling weight or special significance. Giving controlling weight to such opinions would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled."). Instead, the ALJ was entitled to weigh these opinions in light of all of the medical evidence in the record, and come to a conclusion, which I review only to determine whether it is supported by substantial evidence. *See Richardson v. Perales*, 402 U.S. 389, 399 (1971) (stating that in the "not uncommon situation of conflicting medical evidence[,] [t]he trier of fact has the duty to resolve that conflict"). Because the ALJ did not rely simply on the residual functional capacity reports and her own observations, but on other medical evidence in the record, including the reports of Reed's treating physicians, I conclude that the ALJ's decision was supported by substantial evidence.

13

First, the ALJ relied on a November 20, 2003 letter from Dr. Andrew G. Weinstein, who treated Reed for allergies, to Dr. Yezdani, stating that Reed 's implanted nerve stimulator "ha[d] been effective in decreasing pain." (D.I. 10 at 18; *id.* at 263.) The ALJ also relied on the notes of Dr. Kim and Dr. Grossinger, in which both doctors noted that Reed's pain was decreased by the nerve stimulator.[8] (*Id.* at 19-20.) In fact, on January 14, 2004, Dr. Grossinger noted that the stimulator "continue[d] to provide about 20% improvement in pain. (*Id.* at 20; *id.* at 260.) Additionally, the ALJ properly relied on the fact that after her injury, Reed's bone scan, MRI and EMG were all normal.[9] (*See id.* at 19; *id.* at 174-75, 180-81, 183.) Furthermore, Dr. Stephen J. Rodgers examined and evaluated Reed, and on December 16, 2002, found that she was only 30% impaired for purposes of Worker's Compensation. (*Id.* at 18, 287-91.) Such an assessment can be considered evidence that Reed is not totally disabled. *See Lee v. Sullivan*, 945 F.2d 687, 693 (4th Cir. 1991) (finding that Veterans Administration's assessment that the plaintiff was only 20% impaired was "significant in any assessment of the plaintiff's work level", and considering this part of substantial evidence in disability case). Furthermore, the ALJ relied on Dr. Rodgers's reflections

---

[8] Along this same line, the ALJ could also have relied on the notes of both Dr. Grossinger and Dr. Kim, which indicated that Reed was obtaining relief from her pain with the stimulator which Dr. Kim implanted in her spine. (D.I. 10 at 185, 218.) In fact, Dr. Kim's report on May 2, 2003 indicated that Reed was "still getting greater than 50% relief and is able to function." (*Id.* at 218.) Dr. Grossinger also noted that Reed was getting relief, and that despite "continue[d] ... discomfort involving the right arm, neck and back ... she ha[d] noted some improvement with the implanted stimulating unit." (*Id.* at 185.)

[9] The ALJ also could have relied on the fact that an X-ray and second EMG were also both normal. (D.I. 10 at 175, 205.)

14

on the notes of Dr. Kim and Dr. Parkerson. (*Id.* at 18.) All of this evidence is in addition to the residual functional capacity reports and the ALJ's determination of Reed's credibility.

The ALJ's view of Reed's credibility is a determination to which I must accord deference. See *Atlantic Limousine, Inc. v. N.L.R.B.*, 243 F.3d 711, 718 (3d Cir. 2001) ("where credibility determinations are based on the ALJ's assessment of demeanor, those determinations are entitled to great deference as long as relevant factors are considered and resolutions explained"). The ALJ determined that Reed was not credible based on her demeanor at the hearing, including that she "gestured freely with her left hand. Her arm movements with her right had were fluid, not jerky. She extended her right arm almost 180 degrees to reach the microphone. She raised her right arm overhead almost fully."[10] (D.I. 10 at 21.) The ALJ observed of her physical appearance that Reed had "no observable difference between the left and right [arms and hands], and they are not withered. In fact, they are pudgy... the claimant's arms and hands were not thin, nor were they atrophied. Both her hands and arms were symmetrical. Her fingers looked fine, not thin nor atrophied. She did not have a withered hand or arm. She had no color changes."[11] (*Id.* at 18.) Additionally, the ALJ

---

[10] While the ALJ cannot supplant the medical assessment of Reed's doctors with her own, she is entitled to determine that, based on Reed's behavior at the hearing, Reed's subjective complaints of pain were not credible. Importantly, in this case, because all of the medical tests showed that there was nothing organically wrong with Reed, her doctors apparently based their assessments on her subjective complaints of pain. (See D.I. 10 at 20.)

[11] The ALJ did not cite any medical evidence to support her opinion on what the observable manifestations of Reed's condition should be.

found that, although Reed testified that she could not eat because of her pain (*id.* at 47-48), she was overweight. (*Id.* at 21, *see also id.* at 48.)

Finally, it is clear that the ALJ did both consider and give some weight to the reports of Reed's treating physicians, including the July 24, 2004 report filled out by Dr. Yezdani about Reed's ability to work. The ALJ found, consistent with Dr. Yezdani's report, that Reed's residual functional capacity involved "[n]o use of the dominant upper extremity[,]" and a limit of "[l]ift[ing] 10 pounds with the nondominant upper extremity". (D.I. 10 at 22-23.) Only Dr. Yezdani's report contained such limits. (*Id.* at 293-96.) In fact, the Residual Functional Capacity Reports filled out by two doctors who did not examine Reed stated that she could lift twenty pounds with her left, nondominant, extremity, and ten pounds with her right. (*Id.* at 237-45; *id.* at 248-55.) Thus, contrary to Reed's assertions, the ALJ did consider the reports of her treating physicians.

The medical evidence in the record cited by the ALJ, the ALJ's determination that Reed was not credible, and the residual functional capacity reports together provide substantial evidence to support the ALJ's finding that Reed is not disabled within the meaning of the Act. I am bound by a deferential standard of review to conclude that the ALJ's decision should be upheld.

B. Internal Inconsistencies

Reed's second challenge seems to be that the ALJ's finding that she could perform light work is inconsistent with her finding that she could lift nothing with her right hand, her dominant upper extremity, and only ten pounds with her left hand, while light work requires lifting up to twenty pounds at a time. (*See* D.I. 13 at 18.) While Reed is

16

correct in her statement of what light work entails (*see* 20 C.F.R. § 404.1567(b)), she ignores the fact that the ALJ did not find that she could perform a full range of light work. (D.I. 13 at 18.) Instead, after making specific findings about Reed's residual functional capacity, including that Reed could lift nothing with her right hand and only ten pounds with her left hand, the ALJ found that Reed could perform "a limited range of light work." (D.I. 10 at 21.)

Additionally, the ALJ posed a specific hypothetical to the vocational expert, taking into account all of the limitations that she ultimately found Reed suffered from, including that she could lift only ten pounds with her left hand and nothing with her right. (*Id.* at 70.) Based on all of these limitations, the vocational expert testified that Reed could perform her past relevant work as a resident manager at a rehabilitation facility, which he classified as skilled, light duty work. (*Id.* at 70-71.) Additionally, the ALJ further asked the vocational expert whether, if Reed was limited to unskilled work because of her pain medication,[12] there were still jobs in the national economy that Reed could perform. The vocational expert testified, and the ALJ found, that given all of these limitations, Reed could work as a gate attendant, in some security guard jobs, and as a school bus monitor. (*Id.* at 72-73; *see also id.* at 23.)

The ALJ's opinion is thus not internally inconsistent, as the ALJ's conclusion that Reed could perform a limited range of light work is consistent with her specific findings as to Reed's limitations, with the hypothetical posed to the vocational expert, and with the vocational expert's testimony as to what work Reed would be able to perform.

---

[12] The ALJ did not ultimately find that Reed was so limited. (D.I. 10 at 22-23.)

17

Therefore, the ALJ's assessment of Reed's residual functional capacity and her ability to perform either her past relevant work, or other work available in the national economy, is supported by substantial evidence.

## V.     CONCLUSION

Accordingly, the Commissioner's motion for summary judgment (D.I. 18) will be granted, and Reed's motion for summary judgment (D.I. 12) will be denied. An appropriate order will follow.